IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| MAEGON CASSELL<br>17 Micah Court<br>Staunton, VA 24401<br><br><br>Plaintiff,<br><br>v.<br><br>KONICA MINOLTA BUSINESS<br>SOLUTIONS USA, INC.<br>100 Williams Dr.<br>Ramsey, NJ 07446<br><br>Serve:<br><br>Corporation Service Company<br>100 Shockoe Slip. Fl 2<br>Richmond, VA 23219<br><br>Defendant. | Civil Case No: 3:20-cv-00123-DJN |

## COMPLAINT

Plaintiff Ms. Maegon Cassell, by counsel, moves this Court for entry of judgment in her favor, and against Defendant, Konica Minolta Business Solutions USA, Inc., and in support of such Complaint, alleges and avers as follows:

## INTRODUCTION

Within fifteen days (15) of learning of Plaintiff's pregnancy, Plaintiff's supervisor became hostile, developed an incredibly negative attitude towards her, began questioning her

1

daily duties, limiting her ability to travel (which her role required) unilaterally and without reason, and limited her sales territory thus hampering her ability to meet her sales goals. She lost her job, and income. She lost her ability to financially care for her family. Konica's discrimination was devastating.

## NATURE OF ACTION

1. This action sets forth a claim for unlawful discharge under Title VII of the Federal Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Amendments of 1977, 42 U.S.C. §§2000e, et seq., against Defendant Konica Minolta Business Solutions USA, Inc.

## PARTIES

2. Plaintiff, Mrs. Maegon Cassell ("Ms. Cassell" or "Plaintiff") at all times material hereto was and is a resident of the Commonwealth of Virginia. At all times material hereto, Plaintiff was an "employee" of Defendant within the meaning of 42 U.S.C. §2000e(f).

3. Defendant, Konica Minolta Business Solutions USA, Inc. ("Konica" or "Defendant") is a New Jersey corporation doing business in the Western District of the Commonwealth of Virginia and elsewhere. Defendant is an "employer" within the meaning of 42 U.S.C. §2000e(b). Defendant is one of the largest software and technology companies in the United States and has over 500 employees.

## JURISDICTION

4. This Court has original jurisdiction over Ms. Cassell claims under 28 U.S.C. §1331 and 1343(a)(4) and 42 U.S.C. §2000e-5(f)(3).

5. The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

6. Konica was present in and regularly conducts business in the Eastern District of Virginia.

7. Konica is subject to the personal jurisdiction of this Court.

## VENUE

8. Konica was present in and regularly conducted affairs and business activities in the Eastern District of Virginia during the time of Ms. Cassell's employment with Konica.

9. The cause of action alleged in this action, and the conduct giving rise to the cause of action, arose and occurred in the Eastern District of Virginia.

10. The unlawful employment practice committed by Konica in this case occurred in the Eastern District of Virginia, and Ms. Cassell's employment would have continued in the Eastern District of Virginia but for the unlawful discrimination committed by Konica.

11. Venue over Ms. Cassell's claim is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3), 28 U.S.C. § 1331, 1332, and 1343(a)(4).

## PROCEDURAL STATUS

12. Ms. Cassell's employment was terminated on June 5, 2019. She timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). *See Exhibit* 1.

13. On November 26, 2019, the EEOC issued Ms. Cassell a Right to Sue letter. *See Exhibit* 2.

14. This action is timely filed and all procedural prerequisites to suit have been met.

## STATEMENT OF FACTS

15. Ms. Cassell started her employment with Konica in February of 2019 for the Glen Allen, Virginia office at 10900 Nuckols Road Glen Allen, VA 23060, as a Managed Services Executive assigned to the Eastern Region. The Eastern Region was a large territory that Ms. Cassell had authorization to develop business and customers in.

16. Ms. Cassell worked continuously for Konica from February 2019 to her termination on June 5, 2019.

17. At the time she began employment, Ms. Cassell was in her first trimester of pregnancy and it was not yet public knowledge.

18. From February through the end of her employment, Ms. Cassell exemplified tremendous work ethic and truly enjoyed the work that she was doing. Konica was satisfied with her performance as well.

19. At no time during Ms. Cassell's employment did she receive any negative feedback orally or in writing.

20. Throughout Ms. Cassell's employment she was consistently meeting the sales goals established for role.

21. Konica scheduled Ms. Cassell to attend additional training Average Speed to Answer (ASA) training on March 21, 2019.

22. In April of 2019, given Ms. Cassell's potential and strong start in her role, Konica invested time and resources into having Ms. Cassell undergo Managed Printed Services (MPS) training. On April 23, 2019, based on the company's directive Ms. Cassell underwent training with Amber Johnson.

23. Up until the time Ms. Cassell informed her superiors that she was pregnant, she received consistently positive feedback; never received an adverse performance evaluation; was never disciplined nor reprimanded nor did she receive any oral corrective counseling.

24. Ms. Cassell had a good working relationship with her supervisor, Mr. Rob Frayser (Senior Sales Manager). They would often communicate about their similar commutes and share

stories about their communities and neighborhoods. Mr. Frayser was always very enthusiastic and positive in his communications with Ms. Cassell.

25. Mr. Frayser commended Ms. Cassell on the relationships that she was building with her customers.

26. Ms. Cassell was a team player and was liked by all of her colleagues. Ms. Cassell worked to build strong relationships with her coworkers and customers.

27. Ms. Cassell had good working relationship with her colleagues and her superiors, including Mr. Frayser.

28. This changed as soon as Ms. Cassell told her superiors that she was pregnant.

29. On or about May 20, 2019, Ms. Cassell requested to have a meeting with her supervisor Mr. Frayser at the Glen Allen, Virginia office to notify him of her pregnancy and to request her leave of absence for her pregnancy pursuant to the company policies and procedures. During this meeting, he was told that she was pregnant and that Ms. Cassell had a cesarean scheduled for September 4, 2019. she requested maternity leave from August 29, 2019 through November 23, 2019. *Exhibit 3*.

30. After Ms. Cassell disclosed that she was pregnant, Mr. Frayser replied "Oh, wow." A silence followed. He then asked "how long have you known?" The meeting came to an abrupt ending. He promptly advised that human resources would need to get involved in any leave process.

31. Thereafter, Konica began taking adverse and negative actions towards Ms. Cassell and treating her completely different than prior to their notice of her pregnancy.

32. In fact, that same week Mr. Frayser began raising issues about her commute to work and suggested that she start to look for other jobs near her home. This came as a shock to Ms. Cassell

as he had never expressed any concern about her commute in past and was clear that this was in response to her advising him of her pregnancy.

33. Ironically, Rob Frayser also faced a lengthy and significant commute to the Glen Allen, Virginia office. It was a standard practice and issue that they had previously discussed in a positive manner. This change in attitude was very surprising to Ms. Cassell.

34. Just days later Ms. Cassell received a new directive that she could only work out of the Glen Allen, Virginia office. This would significantly affect Ms. Cassell's ability to visit and maintain relationships with her existing customers in Lynchburg and other areas outside of Glen Allen. As part of her role as a Managed Service Executive, part of her compensation and duties include searching for and developing business within the Eastern Region. Glen Allen is a miniscule portion of the region for which Ms. Cassell was assigned and thus, this directive significantly affected her ability to work with existing customers and solicit new business. It took away the flexibility that went along with her position.

35. Prior to notifying Konica of her pregnancy, as a salesperson, as part of her role she was able to work anywhere throughout the region that she was assigned to. Therefore, by suddenly limiting the region that Ms. Cassell could work in, it was clear that it was an effort to make her job difficult and push her out of her role.

36. Also, that week, Mr. Frayser denied Ms. Cassell the opportunity to attend an open house that was open to her division, without any reason. This open house would have been an opportunity for Ms. Cassell to network and develop business with customers. Ms. Cassell's colleagues were allowed to attend and she was the only one that was told that she could not go. ThislThis was a clear departure from past practice. Before informing Konica that she was pregnant, Ms. Cassell was able to attend any open houses that were open to her division.

37. By denying Ms. Cassell the opportunity to attend open houses, Konica was limiting her ability to reach sales goals.

38. On June 5, 2019, Rob Frayser and William Armfield (Vice President of Area Sales) requested that Ms. Cassell participate in a meeting to discuss her employment. Unbeknownst to Ms. Cassell, she was told that Konica was eliminating her position and was thus, terminated.

39. Upon arriving to her meeting, Mr. Armfield proceeded to congratulate Ms. Cassell on her pregnancy. From there, he advised her that it would be her last day of employment.

40. After advising Ms. Cassell that she was being terminated, Konica presented Ms. Cassell with a severance agreement and requested that she sign it. She refused. The agreement provided that Ms. Cassell would be given two (2) weeks severance and among other things, that she would release Konica from any and all claims. *Exhibit 4.* The severance agreement included a provision that required that Ms. Cassell waive any claims under the Age Discrimination in Employment Act (ADEA) and this provision was individual to her without any reference to a group layoff as required by the act.

41. During the meeting, Ms. Cassell was not offered any other position or opportunity for reassignment within Konica. Ms. Cassell was told that she was terminated and had to leave the premises immediately.

42. At no point during the conversation with Mr. Frayser and Mr. Armfield was Ms. Cassell told about any company reorganization or the elimination of her position.

43. They proceeded to tell her that she had to collect her belongings from her desk, relinquish her keys and leave the premises immediately.

44. Konica's decision to terminate Ms. Cassell was solely based on the fact that she was pregnant. Their reasoning that her position eliminated was mere pretext to conceal their discriminatory motive for her termination.

45. Contrary to Konica's position that Ms. Cassell position was terminated, her position has existed and continued to exist since that time.

46. Nearly three days following Ms. Cassell's termination, Konica posted a job advertisement for a position identical to Ms. Cassell's but disguised it by referring to it under a different name Named Account Executive *Exhibit 5.*

47. The Named Account Executive role and the Managed Service Executive Role are virtually identical. *Exhibit 5-6.* Specifically, the education, experience and certification requirements are identical. Further, the benefits and compensation offered were identical as well.

48. Ms. Cassell was fired. She was not offered another position. At no time during the meeting with Ms. Cassell was she told about any other opportunity or offered another position. During that meeting, Ms. Cassell was offered a severance package and told that she was terminated. She was also provided a copy of a letter summarizing their offer of severance and her termination. *Exhibit 4.*

49. Following that meeting, Ms. Cassell did not receive any follow up with any offer of employment, reassignment or transfer.

50. Kinolta has stated that she was offered reassignment and she was not. This is clear pretextual and Ms. Cassell was discriminated against on the basis of her pregnancy. She was offered a severance agreement which made no reference to any group layoff or elimination of position and was subsequently escorted off of the property.

51. As a result of the tremendous stress that Konica placed on Ms. Cassell through their negative treatment of her and her subsequent termination, Ms. Cassell was diagnosed with elevated blood pressure and went into labor at 37 weeks.

52. Ms. Cassell felt she was being penalized for being pregnant and that Konica was trying to intimidate and coerce her into accepting a severance package.

53. As a result of Konica's actions, Ms. Cassell's self-esteem began to suffer considerably. Ms. Cassell began experiencing emotional distress. She felt ashamed for the treatment that she was receiving solely because she disclosed her pregnancy.

### COUNT I – VIOLATON OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED BY THE PREGNANCY DISCRIMINATION ACT OF 1977

54. The foregoing paragraphs 1-53 are incorporated by reference as if set forth in full herein.

55. Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978 ("PDA"), makes it clear that discrimination based on pregnancy, childbirth, or related medical conditions is a form of sex discrimination prohibited by Title VII of the Civil Rights Act of 1964.

56. The purpose of the Pregnancy Discrimination Act is to give pregnant woman who are able to work the opportunity to work on the same conditions as other employees, and when they are unable to work for medical reasons, they must be given the same rights, leave privileges and other benefits, as other workers who are disabled from working.

57. The Pregnancy Discrimination Act requires that pregnant employees be treated the same as non-pregnant employees who are similar in their ability or inability to work.

58. An employer can be held liable for taking an adverse action against a pregnant employee, such as terminating her employment based on her pregnancy.

59. Once Ms. Cassell was at a safe point in her pregnancy, she notified Konica about her pregnancy and scheduled due date as well as her request for time off.

60. Ms. Cassell was a consistently strong performer, received ongoing positive feedback, had never received any negative feedback or evaluation, and had great relationships with her colleagues, supervisors and customers.

61. Ms. Cassell was satisfactorily performing the duties required by her position.

62. Defendant was given notice of Plaintiff's pregnancy and her need for time off, and in response Defendant began mistreating Plaintiff and terminated her.

63. Konica's actions by its drastic change in attitude and subsequent termination less than three week after learning that she was pregnant constituted a violation of Title VII of the Federal Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Amendments of 1977, 42 U.S.C. §§ 2000e, et seq.

64. Ms. Cassell's discharge occurred under circumstances giving rise to an inference of unlawful discrimination.

65. As a direct and proximate result of the unlawful discharge, Ms. Cassell has suffered damages, including past and future loss of income and benefits of employment, lost career opportunities and advancement, other past and future pecuniary losses, emotional stress, inconvenience, embarrassment, and humiliation.

66. As an expecting mother faced with discriminatory termination, Ms. Cassell was terrified about how she would provide for herself and her new baby. Ms. Cassell suffered extreme emotional distress and depressive-like symptoms. She experienced a significant loss of self-esteem, felt ashamed and humiliated for the ridicule she suffered at Konica and for being terminated after notifying Konica that she was pregnant.

67. Because Konica carried out the discharge described above with malice and reckless indifference to the federally protected rights of Ms. Cassell, see Section 109(b) of the Civil Rights Act of 1991, Ms. Cassell is entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Maegon Cassell respectfully requests that this Court enter a judgment in her favor and against Defendant Konica, and further:

(A)    Award Ms. Cassell punitive damages, in an amount to be established at trial;

(B)    Award Ms. Cassell all damages as described above, in amounts to be established at trial, including front pay and back pay, all lost income and benefits of employment both past and future, and compensatory damages for emotional stress, inconvenience, embarrassment, and humiliation;

(C)    Award Ms. Cassell all damages as described above, in amounts to be established at trial;

(D)    Award Ms. Cassell appropriate pre-judgment and post-judgment interest;

(E)    Award Ms. Cassell appropriate injunctive relief;

(F)    Award Ms. Cassell her attorney's fees and costs in this action, including costs and fees of expert witnesses; and,

(G)    Award Ms. Cassell such other and further relief as the Court deems necessary and proper.

**Plaintiff demands trial by jury.**

Dated: February 21, 2020

Respectfully Submitted,

*[signature]*

J. Andrew Baxter (#78275)
Hailey Render (#89995)
General Counsel, P.C.
6849 Old Dominion Drive, Suite 220
McLean, Virginia 22101
(703) 556-0411
(888) 222-6807 (Fax)
abaxter@gcpc.com
hrender@gcpc.com
*Counsel for Plaintiff*